DIAZ, Circuit Judge:
In 2012, the Secretary of Homeland Security established the Deferred Action for Childhood Arrivals ("DACA") policy. Under this policy, certain noncitizens who came to the United States as children could receive deferred action-a decision forbearing their removal from the country. Hundreds of thousands of individuals, including *691 those who appear as Plaintiffs in these appeals, applied for and received grants of deferred action under DACA.
In 2017, the Acting Secretary of Homeland Security rescinded DACA, which prompted a flurry of lawsuits across the country challenging the action. Plaintiffs in these appeals (a group of individuals and organizations) allege that the government's decision to rescind DACA (and its changes to policies governing the use of information provided by DACA applicants) violates the Fifth Amendment to the U.S. Constitution, as well as the Administrative Procedure Act ("APA"), 5 U.S.C. § 500 et seq. , and common law principles of estoppel.
On the government's motion for summary judgment, the district court determined that Plaintiffs' challenges were subject to judicial review, that the rescission of DACA and changes to the government's policies on use of DACA applicant information did not violate the APA, that the constitutional claims were without merit, and that DACA's rescission did not violate principles of estoppel. The court, however, ordered the government (on grounds of estoppel) to comply with the policies promulgated in 2012 on the use of information provided by DACA applicants and enjoined it from altering these policies.
As we explain, we agree with the district court that Plaintiffs' challenges are subject to judicial review. We also agree with the district court that the government's decision to rescind DACA did not require notice and comment under the APA. But the decision nonetheless violated the APA because-on the administrative record before us-it was not adequately explained and thus was arbitrary and capricious. We also conclude that the district court erred in ordering the government to comply with its policies promulgated in 2012 on the use of information provided by DACA applicants and enjoining it from altering those policies.
Given our resolution, we decline, under the doctrine of constitutional avoidance, to decide whether Plaintiffs' Fifth Amendment rights were violated. Nor do we address Plaintiffs' remaining arguments challenging the district court's grant of summary judgment.
I.
A.
Before turning to the record material, some context is in order. The Secretary of Homeland Security is "charged with the administration and enforcement" of the Immigration and Nationality Act ("INA"). 8 U.S.C. § 1103(a)(1). One of the enforcement tools available under the INA is the removal of aliens from the United States. "Aliens may be removed if they were inadmissible at the time of entry, have been convicted of certain crimes, or meet other criteria set by federal law." Arizona v. United States , 567 U.S. 387, 396, 132 S.Ct. 2492, 183 L.Ed.2d 351 (2012) ; see 8 U.S.C. §§ 1182(a), 1227(a) (listing classes of deportable and inadmissible aliens).
Because of the "practical fact," however, that the government can't possibly remove all such aliens, the Secretary has discretion to prioritize the removal of some and to deprioritize the removal of others. Arpaio v. Obama , 797 F.3d 11, 16 (D.C. Cir. 2015) ; see 6 U.S.C. § 202(5) (charging the Secretary of Homeland Security with "[e]stablishing national immigration enforcement policies and priorities"). One form of discretion the government exercises is deferred action, which "is a decision by Executive Branch officials not to pursue *692 deportation proceedings against an individual or class of individuals otherwise eligible for removal from this country." Regents of the Univ. of Cal. v. DHS , 908 F.3d 476, 487 (9th Cir. 2018), petition for cert. filed , 87 U.S.L.W. 3201 (U.S. Nov. 5 & 19, 2018) (No. 18-587).
Immigration authorities have granted deferred action and related forms of relief from deportation or removal since at least the early 1960s. See id. at 487-89 ; The Department of Homeland Security's Authority to Prioritize Removal of Certain Aliens Unlawfully Present in the United States and to Defer Removal of Others, 38 Op. O.L.C. ----, 2014 WL 10788677, at *10-13 (Nov. 19, 2014) ("2014 OLC Opinion")[1] (addressing the Department's practices of granting deferred action ad hoc and through broad policies making relief from removal available to particular groups of aliens). The Supreme Court also has recognized deferred action by name, describing it as the executive branch's "regular practice ... of exercising ... discretion for humanitarian reasons or simply for its own convenience." Reno v. Am.-Arab Anti-Discrimination Comm. ("AAADC "), 525 U.S. 471, 484, 119 S.Ct. 936, 142 L.Ed.2d 940 (1999).
B.
Turning now to the record material, the essential undisputed facts are as follows. To ensure government resources were not spent on the "low priority cases" of "certain young people who were brought to [the United States] as children and know only this country as home," J.A. 129, then Secretary of Homeland Security Janet Napolitano announced in a June 15, 2012, memorandum the policy that has become known as DACA. The DACA Memo made renewable two-year terms of deferred action from removal and authorization for employment available to individuals who came to the United States as children, satisfied certain other eligibility criteria,[2] and passed background checks.
To be considered for deferred action under DACA, applicants had to submit to biometric screening and provide extensive personal information to the Department of Homeland Security. The Department informed applicants that the information provided was "protected from disclosure ... for the purpose of immigration enforcement proceedings" unless the requestor met criteria for commencement of removal proceedings or referral to U.S. Immigration and Customs Enforcement for a determination whether to commence *693 removal proceedings.[3] J.A. 1004. The Department warned, however, that these policies could be "modified, superseded, or rescinded at any time without notice" and were "not intended to" and did not "create any right or benefit, substantive or procedural, enforceable at law by any party." Id.
The DACA Memo made clear that it "confer[red] no substantive right, immigration status[,] or pathway to citizenship." J.A. 131. DACA recipients, however, were eligible to receive a host of other benefits under preexisting statutes and regulations, including advance parole allowing reentry into the United States after travel abroad, social security benefits, and certain forms of public assistance. See 8 U.S.C. §§ 1182(d)(5)(A), 1611(b)(1), 1621(b)(1), (d) ; 8 C.F.R. §§ 1.3(a)(4)(vi), 212.5. DACA recipients also were eligible to receive employment authorization on a showing of economic necessity. See 8 U.S.C. § 1324a(h)(3) ; 8 C.F.R. § 274a.12(c)(14).
In November 2014, then Secretary of Homeland Security Jeh Johnson announced a separate deferred action policy for certain parents of United States citizens and lawful permanent residents that became known as Deferred Action for Parents of Americans ("DAPA").[4] The DAPA memorandum also expanded DACA by (1) extending the deferred action and employment authorization terms from two to three years; (2) removing the "age cap" that previously excluded certain individuals from DACA eligibility; and (3) reducing the period of time that someone needed to be physically present in the United States to be eligible for DACA. See J.A. 167-68.
A coalition of states led by Texas sued to block implementation of the DAPA policy (and its proposed expansions to DACA) on the grounds that it violated the APA and the Take Care Clause of the Constitution, U.S. Const. art. II, § 3 (the " Texas litigation"). See Texas v. United States , 86 F.Supp.3d 591, 604 & n.1, 607 (S.D. Tex. 2015). The district court in that case granted injunctive relief, id. at 671-72, 677-78 & n.111, and the Fifth Circuit affirmed, Texas v. United States , 809 F.3d 134, 178-79, 186, 188 (5th Cir. 2015). The Supreme Court affirmed the Fifth Circuit's judgment by an equally divided vote. United States v. Texas , --- U.S. ----, 136 S.Ct. 2271, 195 L.Ed.2d 638 (2016) (per curiam).
In June 2017 (approximately five months after the Trump administration took office), then Secretary of Homeland Security John Kelly rescinded DAPA but left in place DACA and the deferred action relief and employment authorizations granted between the issuance of the DAPA Memo and the district court's decision in the Texas litigation.
On September 4, 2017, Attorney General Jefferson Sessions wrote to then Acting Secretary Elaine Duke, advising her to rescind DACA. According to the Attorney General:
DACA was effectuated by the previous administration through executive action, without proper statutory authority and *694 with no established end-date, after Congress' repeated rejection of proposed legislation that would have accomplished a similar result. Such an open-ended circumvention of immigration laws was an unconstitutional exercise of authority by the Executive Branch. The related ... DAPA ... policy was enjoined on a nationwide basis in a decision affirmed by the Fifth Circuit on the basis of multiple legal grounds and then by the Supreme Court by an equally divided vote. ... Because the DACA policy has the same legal and constitutional defects that the courts recognized as to DAPA, it is likely that potentially imminent litigation would yield similar results with respect to DACA.[5 ]
In light of the costs and burdens that will be imposed on DHS associated with rescinding this policy, DHS should consider an orderly and efficient wind-down process.
J.A. 379 (internal citations omitted).
The next day, Acting Secretary Duke rescinded DACA and instructed Department personnel to "wind-down" the policy. J.A. 380, 383. The Secretary's Rescission Memo recounts in a "Background" section the DACA and DAPA policies, the Texas litigation, Secretary Kelly's rescission of DAPA, the letter to Attorney General Sessions from the plaintiffs in the Texas litigation, and General Sessions's September 4 letter. The Rescission Memo then states:
Taking into consideration the Supreme Court's and the Fifth Circuit's rulings in the ongoing litigation, and the September 4, 2017[,] letter from the Attorney General, it is clear that the June 15, 2012[,] DACA program should be terminated.
J.A. 383.
The Rescission Memo-which issued without notice or an opportunity for public comment-did not end DACA outright. Rather, it allowed for a case-by-case basis adjudication of initial applications for deferred action and employment authorization accepted by September 5, 2017, and renewal requests accepted by October 5, 2017, from current DACA beneficiaries whose benefits would expire between September 5, 2017, and March 5, 2018.
The Memo stated that the Department would not terminate existing grants of deferred action and employment authorization under DACA "solely based on the directives" in the Memo and would "generally honor" approved applications for advanced parole. Id. But it made clear that the Department would reject all other DACA applications, including initial applications filed after September 5, 2017, and all pending and future applications for advance parole under DACA. Id. The Memo, however, explicitly placed "no limitations" on the Department's "otherwise lawful enforcement ... prerogatives." J.A. 384.
The Department also announced that once an individual's deferred action under DACA expired, information provided by applicants would not be "proactively provided to [law enforcement agencies] for the purpose of immigration enforcement proceedings" unless the requestor met criteria for commencement of removal proceedings or referral to U.S. Immigration and Customs Enforcement for a determination whether to commence removal proceedings. J.A. 1142. For individuals whose pending DACA requests were denied, the *695 announcement stated that "[g]enerally, information provided in DACA requests will not be proactively provided to other law enforcement entities ... for the purpose of immigration enforcement proceedings" unless the requestor posed "a risk to national security or public safety" or met criteria for commencement of removal proceedings or referral to U.S. Immigration and Customs Enforcement for a determination whether to commence removal proceedings. J.A. 1143.
Nearly 800,000 individuals have received deferred action under DACA since its inception.
C.
Plaintiffs' complaint raises a host of challenges to the government's decision to rescind DACA. First, the complaint alleges that the rescission is a substantive rule and thus requires notice-and-comment rulemaking under the APA. Next, it asserts that the government's decisions to rescind DACA and change the way the government proposed to share personal information collected from DACA applicants were arbitrary, capricious, and contrary to law, in violation of the APA, and violated the substantive and procedural due process protections of the Fifth Amendment. Plaintiffs also allege that the decision to rescind DACA violates the equal protection guarantee of the Fifth Amendment. Finally, Plaintiffs say that the government should be equitably estopped from rescinding DACA or using information provided by DACA applicants for immigration enforcement purposes beyond those first announced in 2012, when the government's information-sharing policies were first implemented.
The district court granted partial summary judgment to the government. The court found (contrary to the government's contention) that Plaintiffs' claims were justiciable. Casa De Maryland v. DHS , 284 F.Supp.3d 758, 768-71 (D. Md. 2018). But on the merits, the court determined that DACA's rescission and the government's changes to its policies on information-sharing did not violate the APA and that Plaintiffs' constitutional claims lacked merit. Id. at 771-77. The court also determined that DACA's rescission did not violate the doctrine of estoppel. Id. at 777-78.
The court, however, granted summary judgment to Plaintiffs on the portion of their estoppel claim pertaining to the sharing of DACA applicant information. The court ordered the government to comply with the policies as originally announced in 2012 and enjoined it from altering these policies. Id. at 778-79 ; J.A. 1531-33.
These appeals followed. We review a district court's grant of summary judgment de novo. Roland v. USCIS , 850 F.3d 625, 628 (4th Cir. 2017). "We can affirm a grant of summary judgment only where there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Certain Underwriters at Lloyd's, London v. Cohen , 785 F.3d 886, 889-90 (4th Cir. 2015) (internal quotation marks omitted). We review a district court's grant of an injunction for abuse of discretion. South Carolina v. United States , 907 F.3d 742, 753 (4th Cir. 2018).
II.
We begin with the government's argument that Plaintiffs' claims are not justiciable, an issue we consider de novo. See Bostic v. Schaefer , 760 F.3d 352, 370 (4th Cir. 2014) ; Angelex Ltd. v. United States , 723 F.3d 500, 505 (4th Cir. 2013).
A.
The government contends that Plaintiffs' claims are immune from judicial review *696 under 8 U.S.C. § 1252(g), a provision of the INA stating, "no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the [Secretary of Homeland Security] to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter."
According to the government, § 1252(g) bars review here in two ways. First, noting that the Supreme Court in AAADC observed that § 1252(g)"seems clearly designed to give some measure of protection to 'no deferred action' decisions and similar discretionary determinations," 525 U.S. at 485, 119 S.Ct. 936,[6] the government contends that this section bars review because DACA's rescission is a "no deferred action" decision. But this contention ignores both the plain language of § 1252(g) and the Supreme Court's determination in AAADC that this section "applies only to three discrete actions that the [Secretary of Homeland Security] may take: her 'decision or action' to 'commence proceedings, adjudicate cases, or execute removal orders.' " Id. at 482, 119 S.Ct. 936 (first emphasis added). In rescinding DACA, the Acting Secretary did none of these things.
Second, the government says that § 1252(g) precludes review because DACA's rescission is an initial "action" in the commencement of removal proceedings. As the government would have it, review of its decision to rescind DACA must await a final order of removal. The Supreme Court in AAADC though "specifically rejected a broad reading of the three discrete actions listed in [§] 1252(g)." Regents , 908 F.3d at 504. Specifically, "decisions to open an investigation, [or] to surveil the suspected violator" are not encompassed by § 1252(g) 's jurisdictional bar, even though these decisions "may be part of the deportation process." AAADC , 525 U.S. at 482, 119 S.Ct. 936 ; see Jennings v. Rodriguez , --- U.S. ----, 138 S.Ct. 830, 841, 200 L.Ed.2d 122 (2018) (Alito, J., plurality) ("[In AAADC , w]e did not interpret [ § 1252(g) ] to sweep in any claim that can technically be said to 'arise from' the three listed actions. ... Instead, we read the language to refer to just those three specific actions themselves ." (emphasis added)).
And while we accept that § 1252(g)"is specifically directed at the deconstruction, fragmentation, and hence prolongation of removal proceedings," AAADC , 525 U.S. at 487, 119 S.Ct. 936, the government hasn't moved to remove any of the Plaintiffs. The two Circuit decisions on which the government relies to support the proposition that judicial review of DACA's rescission is available only through review of a final order of removal- Vasquez v. Aviles , 639 F. App'x 898 (3d Cir. 2016), and Botezatu v. INS , 195 F.3d 311 (7th Cir. 1999) -are inapposite. Those cases involved challenges to individual "no deferred action" decisions by aliens adjudicated removable. Vasquez , 639 F. App'x at 901 ; Botezatu , 195 F.3d at 314. The government's reliance on AAADC is therefore misplaced, and we reject its argument that § 1252(g) bars review of Plaintiffs' claims.[7]
*697 B.
The government argues that another provision of the INA-8 U.S.C. § 1252(b)(9)-bars review of Plaintiffs' claims. The government did not press this argument in the district court. But because a party may challenge subject matter jurisdiction for the first time on appeal, Am. Canoe Ass'n, Inc. v. Murphy Farms, Inc. , 326 F.3d 505, 515 (4th Cir. 2003), we consider this issue.
Section 1252(b)(9) provides that "[j]udicial review of all questions of law and fact ... arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter shall be available only in judicial review of a final order under this section." 8 U.S.C. § 1252(b)(9). But that provision doesn't help the government here because it "applies only with respect to review of an order of removal under [ 8 U.S.C. § 1252(a)(1) ]." INS v. St. Cyr , 533 U.S. 289, 313, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001) (emphases added; internal quotation marks and alteration omitted); see Calcano-Martinez v. INS , 232 F.3d 328, 340 (2d Cir. 2000) ("Congress enacted [ § 1252(b)(9) ] for the important purpose of consolidating all claims that may be brought in removal proceedings into one final petition for review of a final order in the court of appeals." (emphasis added)), aff'd , 533 U.S. 348, 121 S.Ct. 2268, 150 L.Ed.2d 392 (2001).
The government's contention that § 1252(b)(9) bars review thus is without merit.
C.
Next, the government contends that judicial review is foreclosed under the APA because the decision to rescind DACA is committed to agency discretion by law. We do not agree.
"Although there is a 'strong presumption' in favor of judicial review of agency action," Speed Mining, Inc. v. Fed. Mine Safety & Health Review Comm'n , 528 F.3d 310, 316 (4th Cir. 2008) (quoting Bowen v. Mich. Acad. of Family Physicians , 476 U.S. 667, 670, 106 S.Ct. 2133, 90 L.Ed.2d 623 (1986) ), the APA bars judicial review of agency action "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). The government says that the Acting Secretary's decision to rescind DACA is a type of agency enforcement decision that is presumptively unreviewable under the Supreme Court's decision in Heckler v. Chaney , 470 U.S. 821, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985).[8] Invoking the "broad discretion exercised by immigration officials" that is a "principal feature of the removal system," Arizona , 567 U.S. at 396, 132 S.Ct. 2492, the government urges that the concerns driving Chaney 's presumption of unreviewability apply *698 with "particular force" in the removal context, a context in which allowing delay would result in ordering the government to allow a "continuing violation" of federal law, AAADC , 525 U.S. at 490, 119 S.Ct. 936.
And while conceding that an agency's expression of a legal interpretation announced in a broad or general enforcement policy may be reviewable, the government says that the decision to rescind DACA is distinguishable because it rested on discretionary enforcement concerns and expressed the Department of Homeland Security's view about the scope of its enforcement authority, not the substantive unlawfulness of the policy. Finally, relying on the Supreme Court's post- Chaney decision in ICC v. Bhd. of Locomotive Eng'rs ("BLE "), 482 U.S. 270, 107 S.Ct. 2360, 96 L.Ed.2d 222 (1987), the government argues that, even if the sole rationale for the rescission decision was the view that DACA was unlawful, such rationale cannot provide a "hook" to support review of the decision.
Because the government relies so heavily on Chaney for its argument, we turn to that decision. There, a group of death row inmates petitioned the Food and Drug Administration to prevent the use in lethal injections of certain drugs that the agency had not approved for that purpose. 470 U.S. at 823-24, 105 S.Ct. 1649. The agency refused to act, based on its view that its jurisdiction to act under the substantive law was unclear and, even if it had jurisdiction, it would decline to exercise that jurisdiction under its inherent discretion to do so. Id. at 824-25, 105 S.Ct. 1649. The petitioners filed suit, seeking an order directing the agency to act. Id. at 825, 105 S.Ct. 1649.
Without addressing the jurisdictional issue, the Court held that the agency's discretionary decision not to enforce the substantive law was unreviewable under the APA. Id. at 828, 837-38, 105 S.Ct. 1649. As the Court explained, such decisions "often involve[ ] a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise," including "whether agency resources are best spent on this violation or another, whether the agency is likely to succeed if it acts, [and] whether the particular enforcement action ... best fits the agency's overall policies." Id. at 831, 105 S.Ct. 1649.
Nonenforcement decisions, the Court observed, generally do not involve the exercise of "coercive power over an individual's liberty or property rights," and, accordingly, do "not infringe upon areas that courts often are called upon to protect." Id. at 832, 105 S.Ct. 1649. Such decisions also "share[ ] to some extent the characteristics of the decision of a prosecutor in the Executive Branch not to indict-a decision which has long been regarded as the special province of the Executive Branch." Id. For these reasons, the Court found, such decisions have "traditionally been committed to agency discretion," and Congress, in "enacting the APA[,] did not intend to alter that tradition." Id. (internal quotation marks omitted). Thus, the Court concluded, "an agency's decision not to take enforcement action should be presumed immune from judicial review under § 701(a)(2)." Id.
Here, however, the Department of Homeland Security's decision to rescind DACA is not a " Chaney -type enforcement action[ ]." Kenney v. Glickman , 96 F.3d 1118, 1123 (8th Cir. 1996). For starters, the Acting Secretary did not exercise her discretion in an individual case.[9] Nor did *699 she identify a violation of the INA against which to act, determine whether government resources would be best spent enforcing one violation over another, or decide whether the Department would succeed if it pursued a particular violation. Rather, Acting Secretary Duke rescinded a general enforcement policy in existence for over five years and affecting hundreds of thousands of enrollees based on the view that the policy was unlawful.
Major agency policy decisions are "quite different from day-to-day agency [ ]enforcement decisions." Nat'l Treasury Emps. Union v. Horner , 854 F.2d 490, 496 (D.C. Cir. 1988). Where an agency expresses a broad or general enforcement policy, different considerations than those driving Chaney 's presumption are at play. "As general statements, they are more likely to be direct interpretations of the commands of the substantive statute rather than the sort of mingled assessments of fact, policy, and law that drive an individual enforcement decision and that are, as Chaney recognizes, peculiarly within the agency's expertise and discretion." Crowley Caribbean Transp., Inc. v. Pena , 37 F.3d 671, 677 (D.C. Cir. 1994).
Accordingly, as courts have recognized, an agency's expression of a broad or general enforcement policy based on the agency's legal interpretation is subject to review. OSG Bulk Ships, Inc. v. United States , 132 F.3d 808, 811-12 (D.C. Cir. 1998) (holding courts had jurisdiction under APA because challenged agency action was a general policy of refusing to enforce provision of substantive law and not a "single-shot non-enforcement decision" (citing Crowley , 37 F.3d at 674-76 )); see Kenney , 96 F.3d at 1123-24 (concluding Chaney applies to "individual, case-by-base determinations of when to enforce existing [law] rather than permanent policies or standards" and did not encompass agency's adoption of general policies stating standards agency deemed acceptable to implement statutory goals); Crowley , 37 F.3d at 672-73, 675 ( Chaney 's presumption applies if "agency bases its refusal to enforce in an individual case solely on a legal interpretation without explicitly relying on its enforcement discretion"); see also Edison Elec. Inst. v. EPA , 996 F.2d 326, 333 (D.C. Cir. 1993) (holding challenge to agency's interpretation of law and regulations advanced in enforcement policy statement was "not the type of discretionary judgment concerning the allocation of enforcement resources that [ Chaney ] shields from judicial review"); Nat'l Wildlife Fed'n v. EPA , 980 F.2d 765, 767, 773 (D.C. Cir. 1992) (holding Chaney 's presumption "is inapplicable or at least rebutted [where plaintiff] raise[d] a facial challenge to the [agency's] statutory interpretation embodied in [a regulation] and d[id] not contest a particular enforcement decision" and citing authority in support). DACA's rescission fits well within this rubric.[10]
The government attempts to distinguish this authority, but its efforts are unavailing. It claims DACA's rescission involved discretionary balancing because it was based on concerns about its legality and "litigation risk," a term that appears to *700 refer to the likelihood the policy would have been invalidated had it been challenged in the Texas litigation. But the Rescission Memo doesn't identify the "risk" of litigation as a "consideration" on which the Acting Secretary relied in rescinding the policy. Rather, the Memo relies on the Attorney General's conclusion that DACA needed to be rescinded because it was unlawful.[11] True, the Attorney General's letter also proffers the conclusion that "potentially imminent litigation" would invalidate DACA, as was the case with DAPA in the Texas litigation. But we agree with the determination of our district court colleague Judge Bates in his opinion resolving challenges to DACA's rescission that this justification "was too closely bound up with [the Attorney General's] evaluation of DACA's legality," NAACP , 298 F.Supp.3d at 234, and thus cuts against Chaney 's presumption of unreviewability.
Nor are we persuaded by the government's claim that DACA's rescission rested on the Department's view of the scope of its enforcement authority, not the substantive unlawfulness of the policy. As Judge Bates aptly noted when presented with the same argument, "this strikes the [c]ourt as a distinction without a difference. To say that a particular agency action is 'without statutory authority' is simply to say that no statutory provision authorizes that action; in a sense, therefore, it is a determination of the substantive content of each statutory provision that might plausibly apply." Id. at 232. We, like Judge Bates, "fail[ ] to perceive any meaningful difference between an agency's conclusion that it lacks statutory authority and its interpretation of a specific statutory provision." Id.[12]
The government also relies on the Supreme Court's decision in BLE as further support for the view that Plaintiffs' claims are unreviewable. But there, the Supreme Court held only that "where a party petitions an agency for reconsideration on the ground of material error, i.e ., on the same record that was before the agency when it rendered its original decision, an order which merely denies rehearing of the prior order is not itself reviewable." 482 U.S. at 280, 107 S.Ct. 2360 (internal quotation marks, ellipsis, and alteration omitted). The government is correct that the Court also rejected the principle that, if an *701 "agency gives a 'reviewable' reason for otherwise unreviewable action, the action becomes reviewable," citing as an example a prosecutor's refusal to institute criminal proceedings based on the belief that the law will not sustain a conviction. Id. at 283, 107 S.Ct. 2360. But BLE still does not advance the government's argument.
For one thing, Plaintiffs here filed a timely challenge to the government's original decision to rescind DACA. BLE doesn't bar review of that type of challenge. Moreover, as the government itself concedes, Appellees' Opening & Response Br. at 19, BLE addressed the scope of judicial review in the context of agency non-enforcement action in an individual case. See Crowley , 37 F.3d at 675-77 (explaining the basis for distinguishing-for purposes of judicial review-between individual enforcement decisions and implementation of broad enforcement policies). DACA's rescission involves a broad enforcement policy, not an individual decision.[13]
In sum, we hold that Plaintiffs' claims are reviewable.[14]
III.
A.
We turn now to the merits and consider first whether the district court erred in granting summary judgment to the government on Plaintiffs' procedural APA claim. The court determined that DACA's rescission was akin to a policy statement and thus was not subject to notice and comment under the APA. Casa , 284 F.Supp.3d at 772. We review this determination de novo. Children's Hosp. of the King's Daughters, Inc. v. Azar ("CHKD "), 896 F.3d 615, 619 (4th Cir. 2018).
The APA generally requires that agencies provide notice of proposals to create, amend, or repeal a rule[15] and an opportunity for interested persons to comment on the proposal. See 5 U.S.C. §§ 551(4) - (5), 553(a) - (c). "Rules issued through the notice-and-comment process are often referred to as legislative rules because they have the force and effect of law." Perez v. Mortg. Bankers Ass'n , --- U.S. ----, 135 S.Ct. 1199, 1203, 191 L.Ed.2d 186 (2015) (internal quotation marks omitted). "[T]he APA provides[, however,] that, unless another statute states otherwise, the notice-and-comment requirement 'does not apply' to 'interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice.' " Id. at 1203-04 (quoting 5 U.S.C. § 553(b)(A) ).
Plaintiffs argue that DACA's rescission required notice and comment under the APA because the Rescission Memo *702 is a legislative rule that mandates how Department officials must act and substantively affects DACA recipients. The government rejects this premise, countering that the Memo is a general statement of policy. We agree with the government.[16]
The critical question in distinguishing between legislative rules and general statements of policy is whether the statement "is of present binding effect; if it is, then the APA calls for notice and comment." Elec. Privacy Info. Ctr. v. DHS ("EPIC "), 653 F.3d 1, 7 (D.C. Cir. 2011) (internal quotation marks and ellipsis omitted). "[S]ubstantive or legislative rule[s], pursuant to properly delegated authority, ha[ve] the force of law, and create[ ] new law or impose[ ] new rights or duties." CHKD , 896 F.3d at 620 (internal quotation marks omitted); see Nat'l Latino Media Coal. v. FCC , 816 F.2d 785, 788 (D.C. Cir. 1987) ("A valid legislative rule is binding upon all persons, and on the courts, to the same extent as a congressional statute."). "To that end, a rule is legislative if it supplements a statute, adopts a new position inconsistent with existing regulations, or otherwise effects a substantive change in existing law or policy." CHKD , 896 F.3d at 620 (internal quotation marks and alteration omitted).
By contrast, general statements of policy "advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power." Vigil , 508 U.S. at 197, 113 S.Ct. 2024 (internal quotation marks omitted). A directive that doesn't establish a "binding norm" and leaves agency officials free to exercise their discretion qualifies as a general statement of policy. Chen Zhou Chai v. Carroll , 48 F.3d 1331, 1341 (4th Cir. 1995) (citing Am. Hosp. Ass'n v. Bowen , 834 F.2d 1037, 1046 (D.C. Cir. 1987), and Mada-Luna v. Fitzpatrick , 813 F.2d 1006, 1015 (9th Cir. 1987) ).
The Rescission Memo removes a mechanism under which individuals could receive deferred action but places "no limitations" on other lawful enforcement prerogatives of the Department of Homeland Security. J.A. 384. As the district court observed, Casa , 284 F.Supp.3d at 772, the Memo doesn't curtail the Department's discretion to make deferred action available on a case-by-case or ad hoc basis. Nor does the Memo, by its terms, create "right[s] or benefit[s]" enforceable "by any party." J.A. 384.
Additionally, although DACA was rescinded based on the government's view that the policy was unlawful, the Rescission Memo doesn't bind subsequent Secretaries who might disagree with this reasoning or bar the Department from implementing other deferred action policies in the future. Contrary to Plaintiffs' arguments, the Memo doesn't "replace[ ] agency discretion with a new binding rule of substantive law," Mada-Luna , 813 F.2d at 1014 (internal quotation marks omitted), affecting the rights of people regulated by the Department, see EPIC , 653 F.3d at 7 (agency's statement "cast in mandatory language so the affected private parties are reasonably led to believe that failure to conform will bring adverse consequences" qualifies as binding on those subject to it (internal quotation marks omitted)). It therefore falls on the *703 policy "end of the spectrum," CHKD , 896 F.3d at 620-21 (internal quotation marks omitted), and thus was exempt from notice and comment under the APA.
B.
We consider next whether the district court erred in granting summary judgment to the government on Plaintiffs' claim that DACA's rescission is substantively invalid under the APA.
1.
The APA requires a reviewing court to "hold unlawful and set aside agency action ... found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). These "criteria render our oversight highly deferential, with a presumption in favor of finding the agency action valid." Friends of Back Bay v. U.S. Army Corps of Eng'rs , 681 F.3d 581, 587 (4th Cir. 2012) (internal quotation marks omitted). This standard, however, "does not reduce judicial review to a rubber stamp of agency action." Id. (internal quotation marks omitted). Rather, "we must engage in a searching and careful inquiry of the [administrative] record, so that we may consider whether the agency considered the relevant factors and whether a clear error of judgment was made." Id. (internal quotation marks omitted). Where agency action qualifies as "unreasonable as a matter of law, it is likely to have been arbitrary and capricious." Id. (citing Marsh v. Or. Nat. Res. Council , 490 U.S. 360, 377 n.23, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989) ). "We evaluate [this issue] de novo[.]" Id.
To comply with § 706(2)(A), an agency "must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co. , 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). The giving of "adequate reasons" for an agency's decision is "[o]ne of the basic procedural requirements of administrative rulemaking." Encino Motorcars, LLC v. Navarro , --- U.S. ----, 136 S.Ct. 2117, 2125, 195 L.Ed.2d 382 (2016). In a challenge under § 706(2)(A), "an agency's action must be upheld, if at all, on the basis articulated by the agency itself." State Farm , 463 U.S. at 50, 103 S.Ct. 2856 ; see Jimenez-Cedillo v. Sessions , 885 F.3d 292, 299 (4th Cir. 2018) ("[A] reviewing court may not speculate on reasons that might have supported a change in agency position [ ]or supply a reasoned basis for the agency's action that the agency itself has not given." (internal quotation marks and citation omitted)).
An agency satisfactorily explains a decision when it provides "enough clarity that its 'path may reasonably be discerned.' " Jimenez-Cedillo , 885 F.3d at 297 (quoting Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc. , 419 U.S. 281, 286, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974) ). If the agency provides such an explanation, "we will uphold its decision." Id. at 297-98, 95 S.Ct. 438. "But where the agency has failed to provide even that minimal level of analysis, its action is arbitrary and capricious and so cannot carry the force of law." Encino Motorcars , 136 S.Ct. at 2125.
These principles apply with equal force to a change in agency position. Jimenez-Cedillo , 885 F.3d at 298. Thus, in changing policies, agencies "must 'provide a reasoned explanation for the change.' " Id. (quoting Encino Motorcars , 136 S.Ct. at 2125 ). "At a minimum, an agency must 'display awareness that it is changing position and show that there are good reasons *704 for the new policy.' " Id. (quoting Encino Motorcars , 136 S.Ct. at 2126 ). The agency's explanation must address the "facts and circumstances that underlay or were engendered by the prior policy," including any "serious reliance interests." Encino Motorcars , 136 S.Ct. at 2126 (quoting FCC v. Fox Television Stations, Inc. , 556 U.S. 502, 515-16, 129 S.Ct. 1800, 173 L.Ed.2d 738 (2009) ). "An 'unexplained inconsistency' in agency policy indicates that the agency's action is arbitrary and capricious, and therefore unlawful." Jimenez-Cedillo , 885 F.3d at 298 (quoting Encino Motorcars , 136 S.Ct. at 2125 ).
2.
Plaintiffs argue that DACA's rescission was arbitrary and capricious because the Department of Homeland Security failed to give a reasoned explanation for the change in policy, particularly given the significant reliance interests involved. We agree.[17]
As we have explained, DACA was rescinded based on the Department's view that the policy was unlawful. But neither the Attorney General's September 4 letter nor the Department's Rescission Memo identify any statutory provision with which the DACA policy conflicts. Cf. Encino Motorcars , 136 S.Ct. at 2127 (rejecting as insufficient agency statement regarding statutory exemption proffered in support of policy change where agency did not "analyze or explain" why statute should be interpreted as agency suggested).
The Attorney General's letter does mention that the Fifth Circuit affirmed the injunction against the DAPA policy on "multiple legal grounds" in the Texas litigation, J.A. 379, and the Rescission Memo cites to this ruling. The Fifth Circuit's ruling was based in part on its determination that the DAPA policy likely ran counter to the INA's "intricate process for illegal aliens to derive a lawful immigration classification from their children's immigration status." Texas , 809 F.3d at 179. There is no dispute here, however, that "DACA has no analogue in the INA." NAACP , 298 F.Supp.3d at 239 (internal quotation marks omitted). Further, as the Fifth Circuit explained in reaching its conclusion, "DACA and DAPA are not identical." Texas , 809 F.3d at 174.
The Attorney General's letter also asserts that DACA suffered from the same "constitutional defects that the courts recognized as to DAPA." J.A. 379. The courts in the Texas litigation, however, did not address constitutional claims. And while the Attorney General urged in his letter that his office had a duty to "defend the Constitution" and "faithfully execute the laws passed by Congress," J.A. 379, he does not explain how allowing the DACA policy to remain in effect would violate that duty.
The Attorney General's letter and the Rescission Memo also proffer the concern-based on the Attorney General's determination that the DAPA and DACA policies share the same legal defects-that "potentially imminent" litigation would result in a ruling in the Texas litigation enjoining DACA. Entirely absent, however, is an explanation why it was likely that the district court in the Texas litigation would have enjoined DACA.
Further, the 2014 OLC Opinion outlining the Department's authority to implement the DAPA policy identified "from the *705 nature of the Take Care duty" at least "four general ... principles governing the permissible scope of enforcement discretion," J.A. 137-38; 2014 WL 10788677, at *5-6, and noted that concerns "animating DACA were ... consistent with the types of concerns that have customarily guided the exercise of immigration enforcement discretion," J.A. 149 n.8; 2014 WL 10788677, at *13 n.8.
The point is that the Department had before it at the time it rescinded DACA a reasoned analysis from the office tasked with providing legal advice to all executive branch agencies that supported the policy's legality. Yet the Department changed course without any explanation for why that analysis was faulty. Cf. Fox Television Stations , 556 U.S. at 516, 129 S.Ct. 1800 ("[A] reasoned explanation is needed for disregarding facts and circumstances that underlay ... the prior policy.").
Nor did the Department adequately account for the reliance interests that would be affected by its decision. Hundreds of thousands of people had structured their lives on the availability of deferred action during the over five years between the implementation of DACA and the decision to rescind. Although the government insists that Acting Secretary Duke[18] considered these interests in connection with her decision to rescind DACA, her Memo makes no mention of them.
Accordingly, we hold that the Department's decision to rescind DACA was arbitrary and capricious and must be set aside.
IV.
We turn next to the district court's rulings (1) granting summary judgment to Plaintiffs on the portion of their estoppel claim pertaining to sharing of DACA applicant information, and (2) ordering the government to comply with the information-sharing policies promulgated in 2012 and enjoining it from altering those policies.
"Equitable estoppel is a well-established concept invoked by courts to aid a party who, in good faith, has relied, to his detriment, upon the representations of another." United States ex rel. Humble Oil & Ref. Co. v. Fid. & Cas. Co. of N.Y. , 402 F.2d 893, 897 (4th Cir. 1968) (internal footnote omitted). To establish equitable estoppel, "[i]t is only necessary to show that the person [sought to be] estopped, by ... statements or conduct, misled another to his prejudice." Id. at 898 (quoting United States ex rel. Noland Co. v. Wood , 99 F.2d 80, 82 (4th Cir. 1938) ). As against the government, "estoppel may only be justified, if ever, in the presence of affirmative misconduct by government agents." Dawkins v. Witt , 318 F.3d 606, 611 (4th Cir. 2003).
In enjoining the government, the district court determined that estoppel "potentially would apply to any use for immigration enforcement of the information collected ... during DACA registrations" because "the Government promised not to transfer or use the information gathered from [DACA applicants] for immigration enforcement." Casa , 284 F.Supp.3d at 778.
We disagree with the district court. The government did not make such a promise or suggest in any other way that its policies governing the sharing of information provided by DACA applicants would never *706 change. Rather, the government warned DACA applicants that information they provided could be used for immigration enforcement where criteria for commencement of removal proceedings or referral to law enforcement for a determination whether to commence such proceedings were met. It also warned that its policies governing the sharing of applicant information could be "modified, superseded, or rescinded at any time without notice" and created no "right or benefit." J.A. 1004. In view of these clear and unequivocal warnings, Plaintiffs could not reasonably believe that the information they provided as part of their DACA application would never be used for immigration enforcement purposes. Cf. Volvo Trucks of N. Am., Inc. v. United States , 367 F.3d 204, 212 (4th Cir. 2004) ("Equitable estoppel requires reasonable reliance."). Plaintiffs' equitable estoppel claim thus necessarily fails.
V.
We turn finally to Plaintiffs' constitutional claims, which were dismissed by the district court. We decline to decide whether DACA's rescission violates the Fifth Amendment's due process and equal protection guarantees under the "well established principle governing the prudent exercise of this [c]ourt's jurisdiction that normally the [c]ourt will not decide a constitutional question if there is some other ground upon which to dispose of the case." Escambia Cty. v. McMillan , 466 U.S. 48, 51, 104 S.Ct. 1577, 80 L.Ed.2d 36 (1984) (per curiam). Because we have determined that DACA's rescission violates the APA, we need go no further. See , e.g. , Veasey v. Abbott , 830 F.3d 216, 265 (5th Cir. 2016).
We also decline to decide whether Plaintiffs' Fifth Amendment rights were violated by the policies announced on September 5, 2017, regarding the sharing of personal information from DACA applicants.[19] McMillan , 466 U.S. at 51, 104 S.Ct. 1577. Our decision today restores DACA to its pre-September 5, 2017, status, rendering a nullity the information-sharing policies announced on September 5. It therefore is unnecessary to address Plaintiffs' constitutional challenge to these policies. See Veasey , 830 F.3d at 265.[20]
VI.
To sum up: We affirm the district court's rulings that Plaintiffs' claims are justiciable and that DACA's rescission did not require notice and comment under the APA. We reverse the district court's ruling sustaining the rescission of the policy as valid under 5 U.S.C. § 706(2)(A). DACA's rescission is vacated as arbitrary and capricious, and the matter is remanded for further proceedings consistent with this opinion. We reverse the district court's ruling finding Plaintiffs entitled to injunctive relief on equitable estoppel grounds, reverse the grant of summary judgment in Plaintiffs' favor, and vacate the injunction. Because we find it unnecessary to decide Plaintiffs' constitutional challenges to *707 DACA's rescission and the related changes to the Department's policies governing use of information provided by DACA applicants, we vacate the district court's judgment on these issues and dismiss those claims.
AFFIRMED IN PART, REVERSED IN PART, VACATED IN PART, DISMISSED IN PART, AND REMANDED

The Office of Legal Counsel, or OLC, is an office within the U.S. Department of Justice that drafts legal opinions of the Attorney General and provides its own written opinions and other advice in response to requests from various agencies within the executive branch. See 28 U.S.C. § 512 (providing that agency heads may seek legal advice from the Attorney General); 28 C.F.R. § 0.25 (delegating Attorney General's authority to render legal advice to OLC); "Office of Legal Counsel," The United States Department of Justice, https://www.justice.gov/olc (saved as ECF opinion attachment). Although not binding on courts, OLC opinions "reflect[ ] the legal position of the executive branch" and "are generally viewed as providing binding interpretive guidance for executive agencies." United States v. Arizona , 641 F.3d 339, 385 n.16 (9th Cir. 2011) (internal quotation marks omitted) (Bea, J., concurring in part and dissenting in part), aff'd in part, rev'd in part , 567 U.S. 387, 132 S.Ct. 2492, 183 L.Ed.2d 351 (2012).

In its original form, deferred action was available to individuals who were under age 16 when they came to the United States, were not above age 30, had continuously (Continued) resided in the United States for at least five years preceding June 15, 2012, and were present in the country on June 15, 2012, and satisfied certain other requirements relative to public safety and education or military service.

Separately, the Department noted that the information provided could be shared with national security and law enforcement agencies "for purposes other than removal." J.A. 1004.

The 2014 OLC Opinion concluded that DAPA "would constitute a permissible exercise of [the Department of Homeland Security]'s enforcement discretion under the INA." J.A. 162; 2014 WL 10788677, at *23. While the opinion doesn't directly address the Department's authority to implement DACA, it does recount that, before DACA was announced, the OLC had "orally advised" the Department that the policy would be permissible "provided that immigration officials retained discretion to evaluate each application on an individualized basis." J.A. 149 n.8; 2014 WL 10788677, at *13 n.8.

Plaintiffs in the Texas litigation had written to General Sessions in June 2017, requesting that the Secretary of Homeland Security rescind DACA and prohibit new grants and renewals of deferred action. The letter warned that, if the Executive Branch failed to so act, plaintiffs there would amend their complaint to challenge DACA.

The Supreme Court said as much after reviewing a treatise describing the practice of deferred action and litigation that would result when it was not granted. AAADC , 525 U.S. at 484-85, 119 S.Ct. 936. That treatise, however, referred explicitly to "[e]fforts to (Continued) challenge the refusal to exercise [deferred action] on behalf of specific aliens ." Id. at 485, 119 S.Ct. 936 (emphasis added). Plaintiffs don't challenge the refusal to grant deferred action to a particular individual.

Accord Regents , 908 F.3d at 504 (holding § 1252(g) doesn't deprive courts of jurisdiction to review DACA's rescission); NAACP v. Trump , 298 F.Supp.3d 209, 224 (D.D.C. 2018) (rejecting as "misplaced" government's reliance on AAADC and finding § 1252(g) didn't bar review of challenges to DACA's rescission), appeals docketed , Nos. 18-5243, 18-5245 (D.C. Cir. Aug. 10 & 13, 2018), petition for cert. before judgment filed , 87 U.S.L.W. 3204 (U.S. Nov. 5, 2018) (No. 18-588); Batalla Vidal v. Duke , 295 F. Supp. 3d 127, 152-54 (E.D.N.Y. 2017) (rejecting government's § 1252(g) argument in challenge to DACA's rescission), appeals docketed , Nos. 18-1985, 18-1986 (2d Cir. July 5, 2018), petition for cert. before judgment filed , 87 U.S.L.W. 3201 (U.S. Nov. 5, 2018) (No. 18-589).

The government doesn't appear to seriously contest that Plaintiffs' procedural APA claim challenging the decision to rescind DACA is subject to judicial review. Accord Lincoln v. Vigil , 508 U.S. 182, 195-98, 113 S.Ct. 2024, 124 L.Ed.2d 101 (1993) (process by which an agency makes a rule may be reviewed for compliance with applicable procedural requirements, regardless of reviewability of the substance of the rule).

The government correctly observes that an agency's discretionary decision to enforce the law may be unreviewable under § 701(a)(2). See Speed Mining , 528 F.3d at 311, 317-18 (holding agency's discretionary decision to enforce substantive law by issuing citations for safety violations was committed to agency discretion and therefore unreviewable). But Speed Mining is distinguishable because it involved a discretionary enforcement decision in an individual case.

Our dissenting colleague contends that decisions from the D.C. Circuit supporting our view that DACA's rescission is reviewable don't explain how they can be reconciled with Chaney . Dis. op. at 712-14. We disagree. See Crowley , 37 F.3d at 675-77 ; Nat'l Wildlife Fed'n , 980 F.2d at 772-73.

See 8 U.S.C. § 1103(a)(1) ("[D]etermination[s] and ruling[s] by the Attorney General with respect to all questions of law shall be controlling [on the Secretary of Homeland Security]."); see Yanez-Marquez v. Lynch , 789 F.3d 434, 450 n.6 (4th Cir. 2015) (finding Attorney General's position controlling where Department of Homeland Security and Attorney General had conflicting views about applicability of a legal doctrine).

Our dissenting colleague notes that Acting Secretary Duke didn't say in the Rescission Memo "that DACA must be terminated or that she lacked the legal authority to enforce DACA or a DACA-like program." Dis. op. at 715. It is true that Acting Secretary Duke wrote only that it was clear DACA "should" be terminated. J.A. 383. Standing alone, however, "should" can express the notion of requirement or obligation. Should , Webster's Third New International Dictionary Unabridged (2002) ("used ... to express duty, obligation, [or] necessity"). Given the Attorney General's evaluation of DACA's legality and the absence of any reference to litigation risk in the Rescission Memo's list of considerations, this use of the word "should" supports our conclusion, ante , at 698-99, 699-700, that the Secretary rescinded DACA based on her view that the policy was unlawful. Contrary to our dissenting colleague's view, our decision today does not intrude on discretionary prerogatives of the Executive Branch (see Dis. op. at 713-14); rather, it "preserves the judiciary's role as the ultimate arbiter of statutory meaning while at the same time affording agencies breathing space to adopt enforcement policies for discretionary reasons," NAACP , 298 F.Supp.3d at 234.

We accept that agency action doesn't become reviewable simply because "the agency gives a 'reviewable' reason for otherwise unreviewable action." BLE , 482 U.S. at 283, 107 S.Ct. 2360. But, as we've explained, DACA's rescission is not such an unreviewable decision. See NAACP , 298 F.Supp.3d at 231 ("[A]n otherwise reviewable interpretation of a statute does not become presumptively unreviewable simply because the agency characterizes it as an exercise of enforcement discretion.").

The government has not cross-appealed from the district court's additional determination that all Plaintiffs had standing, Casa , 284 F.Supp.3d at 771, and the parties have not briefed this issue on appeal. Nonetheless, reviewing this issue de novo, Bostic , 760 F.3d at 370, we agree with the district court that the individual DACA recipient Plaintiffs have standing to sue. We consequently need not consider whether the other Plaintiffs have standing. See id. at 370-71.

The parties don't dispute that DACA's rescission qualifies as a "rule" for APA purposes. See 5 U.S.C. § 551(4).

Accord Regents , 908 F.3d at 512-14 (holding DACA's rescission is not a binding rule of substantive law); NAACP , 298 F.Supp.3d at 237 ("[T]he rescission of DACA was exempt from notice and comment as a general statement of agency policy."); Batalla Vidal v. Nielsen , 291 F.Supp.3d 260, 270-73 (E.D.N.Y. 2018) (dismissing notice-and-comment claims because Rescission Memo is not a legislative rule), appeals docketed , Nos. 18-1521, 18-1525, 18-1986 (2d Cir. May 21 & July 5, 2018).

Plaintiffs also assert that (1) the district court failed to consider evidence of "bad faith" and "animus" underlying the decision to rescind DACA presented in their complaint and (2) the Department's conclusions about DACA's legality are substantively incorrect. Given our disposition, we decline to address these arguments.

The government urges us to consider the June 2018 memorandum from former Secretary of Homeland Security Kirstjen Nielsen belatedly proffered by the government as a basis for upholding DACA's rescission. We decline to do so because the memorandum was not part of the administrative record in this appeal. Fla. Power & Light Co. v. Lorion , 470 U.S. 729, 743, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985).

Although the district court found Plaintiffs' due process claims lacked merit, its analysis addressed DACA's rescission, not information-sharing. Casa , 284 F.Supp.3d at 775-77.

Plaintiffs also contend that the district court misapplied Fed. R. Civ. P. 56 by failing to (1) afford them a reasonable opportunity for discovery on their claims, (2) consider or address their statement of material facts in dispute, and (3) view the facts in the light most favorable to them. They allege further that the district court misapplied the APA by granting summary judgment to the government without addressing their (Continued) contention that the administrative record was incomplete and by failing to consider evidence of "bad faith and improper behavior" by government officials. Given our disposition, we find it unnecessary to address these issues.